**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------------------

PAUL J. OSTLING,

          Plaintiff,

   v.

OOO BRUNSWICK RAIL
MANAGEMENT, BRUNSWICK RAIL
GROUP LIMITED, MARTIN AXEL
CHRISTER ANDERSSON, GERARD DE
GEER, CHARLES EMMITT RYAN,
MARLEN MANASOV, NICOLAS
PASCAULT, VICTOR KOSHKIN, ELENA
NAUMOVA, and DOES 1–10,

          Defendants.

-------------------------------------------------------------

:
:
:
:
: CIVIL ACTION NO.:
:
:
:
:
:
:
:
:
:
:
:
: April 6, 2017
:
:

**COMPLAINT**

    Plaintiff Paul J. Ostling alleges as follows against Defendants OOO Brunswick Rail

Management ("BRM"), Brunswick Rail Group Limited ("BRGL") (collectively with BRM,

"Brunswick" or the "Company"), Martin Axel Christer Andersson, Gerard De Geer, Charles

Emmitt Ryan, Marlen Manasov, Nicolas Pascault, Victor Koshkin, Elena Naumova and Doe

Defendants (collectively, "Defendants"):

**NATURE OF THE CASE**

    1.      This action arises from Defendants' persecution and unlawful retaliation against

Paul J. Ostling, the Company's former CEO and director, for refusing to participate in a scheme

to defraud the Company's bondholders and junior debtholders (collectively "creditors"), and for

his supporting and joining whistleblower complaints filed with the United States Securities and

Exchange Commission ("SEC") and the United Kingdom's Financial Conduct Authority ("FCA").

2.      Defendants retaliated against Mr. Ostling first by removing him as a director and officer of the Company and later by filing vexatious lawsuits against him and another whistleblower in this District and the Northern District of California.  Defendants continued their retaliation against Mr. Ostling by wrongfully denying his claim for indemnification for the costs of defending himself in those actions.  Most recently, Defendants have implicitly threatened Mr. Ostling with criminal prosecution in Russia and furthered civil litigation, in Russia.

3.      Defendants' conduct violated and continues to violate the whistleblower protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78u-6.  Defendants also have breached and continue to breach their agreements to indemnify Mr. Ostling in violation of his employment agreement with the Company and the Company's bye-laws.  Mr. Ostling seeks statutory remedies provided for pursuant to Dodd-Frank, as well as indemnification provided for in the Appointment Agreement and bye-laws, and such other relief as this Court deems just and proper.

## PARTIES

4.      Plaintiff is a resident of the State of Connecticut, and maintains a residence in Moscow, Russian Federation.  Plaintiff served as Chairman of the Board of Directors of Brunswick Rail Ltd. (the "Board") from July 2012 until September 2015.  In October 2015, Plaintiff resigned his Board Chairmanship to become the acting CEO of BRGL.  In November 2015, Plaintiff also became the CEO of BRM.  In or around January 2016, Plaintiff was also made the General Director of BRM.  Throughout this period, Plaintiff remained a Director of the Board.  Plaintiff held his positions as Director of the Board and CEO of the

Company until his removal in November 2016.  Plaintiff provided his services to the Company from Connecticut and Russia.

5.      Defendant BRM is a Russian Limited Liability Company with its principal place of business in Moscow, Russian Federation.  Defendant BRM is engaged in the railcar leasing business.

6.      Defendant BRGL, BRM's parent company, is a Bermuda company with its principal place of business in Hamilton, Bermuda.

7.      Defendant Martin Axel Christer Andersson is an individual who is an original founder of Brunswick and remains a substantial shareholder of the Company, owning approximately ▓▓▓▓ of Brunswick's shares.  Andersson joined Brunswick's Board in 2005 and currently serves as its Chairman.  Andersson worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as Director of the Board.

8.      Defendant Gerard De Geer is an individual who is an original founder of Brunswick and joined Brunswick's Board in 2006 and currently serves on its Board.  De Geer is also a substantial Brunswick shareholder owning approximately ▓▓▓▓ of shares.  De Geer worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as Director of the Board.

9.      Defendant Charles Emmit Ryan is an individual who currently serves on Brunswick's Board.  Ryan is a principal in and a founder of UFG Private Equity ("UFG"), which is a shareholder of Brunswick. Ryan worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as Director of the Board.

10.     Defendant Marlen Manasov is an individual who serves on Brunswick's Board, and is a shareholder of Brunswick.  Manasov worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as Director of the Board.

11.     Defendant Nicolas Pascault is an individual who joined Brunswick in 2004 as Managing Partner and CFO and is a shareholder of Brunswick.  In October 2015, Pascault became First Deputy CEO and currently serves on Brunswick's Board. Pascault worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as Director of the Board.

12.     Defendant Victor Koshkin is an individual who serves as the General Director of BRM and is a shareholder of Brunswick. Koshkin worked closely with the other individual defendants named herein, and defendants under the fictitious names Does 1 through 10, in the performance of his duties as General Director of BRM, and before that as Managing Director – Marketing & Investor Relations of Brunswick.

13.     Defendant Elena Naumova is an individual who serves as the General Counsel and Managing Director of Legal Services of Brunswick, and is also a shareholder of Brunswick. Naumova worked closely with the other individual defendants named herein, and defendants under the fictitious names of Does 1 through 10, in the performance of her duties as Managing Director and General Counsel.

14.     Plaintiff is ignorant of the identities and capacities of the defendants under the fictitious names Does 1 through 10.  Each of the Doe defendants is responsible in some manner for the acts alleged, and have proximately caused Plaintiff's damages.  Plaintiff will seek leave to

amend this complaint to allege the Doe defendants' identities and capacities as soon as such information is made available to Plaintiff.

## OTHER RELEVANT ENTITIES

15.     The European Bank for Reconstruction and Development ("EBRD") is a shareholder of Brunswick, holding approximately ▇▇▇▇ of shares. Throughout the times relevant to the matters of this Complaint, EBRD acted with respect to Brunswick through Kamen Zahariev, Marina Kerdemelidi, and Vitaly Kuznetsov.

16.     The International Financial Corporation ("IFC") is a shareholder and creditor of Brunswick. Throughout the times relevant to the matters of this Complaint, IFC acted with respect to Brunswick through Ian Twinn, Sergei Myaterev, Laura Vecvagare, and Deema Fakhoury. IFC owns approximately ▇▇▇▇ of Brunswick's equity shares and is a bondholder of the Brunswick 2017 Bonds (described more fully below).

17.     VneshTorg Bank ("VTB") is a shareholder and creditor of Brunswick.  VTB holds approximately ▇▇ of Brunswick shares and is a bondholder of the Brunswick 2017 Bonds. VTB had also agreed, in 2015 through 2016, to be the lender of a substantial loan to Brunswick to be used to fund a transaction to buy back all of the Bonds from the Bondholders, including VTB.

18.     Sumitomo Corporation ("Sumitomo") is a shareholder and creditor of Brunswick. Sumitomo originally purchased approximately ▇▇▇ of Brunswick shares.  Until May 2016 a Sumitomo representative sat on the Board of Brunswick.  In 2012, Sumitomo provide a loan to Brunswick through an affiliate of Sumitomo so that Brunswick could purchase Sumitomo's equity shares.  Currently, Sumitomo is a ▇▇ shareholder and is owed at least ▇▇▇▇▇▇ on its loan.

19.     Macquarie Russia and CIS Infrastructure Fund ("MRIF"), is a shareholder and creditor of Brunswick.  In 2010, MRIF purchased approximately REDACTED of Brunswick shares for REDACTED and also issued to Brunswick an interest-bearing Convertible Mezzanine loan in the original principal amount of $60 million (the "Mezzanine Loan"). With unpaid interest, the current principal of the Mezzanine Loan exceeds $101 million and represents Brunswick's largest unsecured debt. Since its investments in Brunswick in 2010, MRIF has had a representative on Brunswick's Board. Currently, that Board member is Aaron Rubin, who from October 2015 until at least November 15, 2016, also held the position as the Chairman of the Brunswick Audit, Remuneration and Credit Committees. Another MRIF executive, Dennis Mosolov, also actively participated in the affairs of Brunswick on behalf of MRIF.

20.     PJT Partners is an advisory services firm appointed by an ad hoc group consisting of 70% of the outstanding holders of the Brunswick 2017 Bond.  The Brunswick 2017 Bond is a $600 million 6.50 percent guaranteed note traded on the London Stock Exchange and due in 2017.  The Company marketed and issued the bond in 2012 to various investors, including U.S.-based investors (collectively, the "bondholders").

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over this action pursuant to the Dodd-Frank Act, 15 U.S.C. § 78u-6, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the indemnification claims.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the retaliation occurred in this District.

## FACTS

### Mr. Ostling's Background and Employment With the Company

23.     After beginning his legal career in 1973 at Chadbourne & Parke LLP, Mr. Ostling joined the accounting firm of Arthur Young (now Ernst & Young) in 1977, as Assistant General Counsel.  Mr. Ostling became Associate General Counsel in 1979; partner in 1982; and worked there for a total of 30 years ultimately becoming the firm's Global Chief Operating Officer in May 2003.  In 2007, Mr. Ostling retired from Ernst & Young to become a member of the Board of Directors and Audit Committee Chairman of Mobile TeleSystems, a public company with American Depository Receipts listed on the New York Stock Exchange, and also joined Kungur Oilfield Equipment & Services as its CEO.  Mr. Ostling has also served as a member and chairman of several other audit committees, including on the boards of National Central Depository of the Moscow Stock Exchange (MOEX Group), Innolume GmbH, Domodedovo - East Line, Uralkali (listed on the LSE and the Moscow Exchange), Kungur Oilfield Equipment Services, Uralchem, and Promsvyazbank.  Between April 2013 and February 2015, Mr. Ostling also served as Chairman of the Audit Committee for the Board of Directors of Datalogix, which was acquired by Oracle.

24.     In addition to his corporate work, Mr. Ostling has served on the boards of several nonprofits, including currently as President of Boy Scouts of America's Transatlantic Council, and before that as Chairman of the Business Council for International Understanding, as a member of the World Board of Governors of the United Service Organizations ("USO"), the Better Business Bureau of New York, and the Dean's Committee of Fordham University School of Law.

25.    Mr. Ostling was asked to join Brunswick in 2012 and was appointed Chairman of

the Board pursuant to a Director agreement dated July 16, 2012 (the "Appointment Agreement").

In September 2015, the Company terminated the then-CEO, Alex Genin, and appointed

Mr. Ostling as CEO.  Throughout his tenure at the Company as its Chairman of the Board and

then as CEO, Mr. Ostling performed his services for the Company from his home in New

Canaan, Connecticut, at the Company's offices in Moscow, and in other areas, based on his

travel.

### The Indemnity Provisions Under Mr. Ostling's
### Appointment Agreement and the Company's Bye-Laws

26.    Mr. Ostling's Appointment Agreement requires the Company to indemnify

Mr. Ostling for all costs and expenses, including legal costs and expenses, relating to or arising

out of defense of any civil or criminal proceeding.  Specifically, the indemnity provision,

Paragraph 17 of the Appointment Agreement, provides:



27.    Paragraph 123(a) of Brunswick Rail Leasing Limited's Bye-Laws, as adopted on

March 31, 2007, and Paragraph 123(a) of Brunswick Leasing Limited's Bye-Laws, approved on

November 3, 2003, also contain indemnity provisions, which provide:



**REDACTED**

**The Company's Financial Condition and Negotiations Regarding Its Debts**

28.     At the time Mr. Ostling took over as CEO in 2015, the Company's debt included: the $600 million bond due in 2017;  MRIF's $101 million Mezzanine Loan due in December 2020; and, Sumitomo's "shareholder" related party loan, which was due to be paid in December 2016.

29.     The Company and its officers and directors are obligated to disclose truthful material information to its creditors who purchased these debt securities, as well as its shareholders, including timely disclosing publicly price-sensitive and material information regarding the Company.

30.     As disclosed in the Company's public disclosures, the Company was in the midst of "an extremely challenging market situation" because of the decline in the Russian Ruble, and the simultaneous decline in rail traffic, volumes and the rental rates for railcars and was negotiating amendments to its loan facilities and outstanding debt.

31.     As announced in the Company's public filings on June 30, 2016, the Company engaged in substantive discussions with an ad-hoc group of noteholders and its advisors in connection with the Company's notes but at that time was unable to reach a consensual transaction.

32.     The Company announced on June 30, 2016 that in regard to its creditors, "[a] consensual transaction remains the Company's preferred outcome."  The Company also announced that a committee of shareholders (the "Shareholder Committee") was formed comprising six parties representing REDACTED of the outstanding equity shares of the Company, stating:

REDACTED

The Committee has retained legal advisors and has been formed to seek to protect and maximise the value of their respective equity stakes in the Company and to explore all possible options to achieve this, including a sale of some or all of the equity in the Company.  The Committee has also commenced the process of appointing a financial advisor.  It is possible that that process will result in a sale of all of the shares in the Company.

33.     The Company publicly disclosed that as of the end of September 2016 it had total book assets of $503 million but total liabilities of $767 million.  Certain of the Company's assets include deferred tax assets and other assets carried historically, but in the current state of the Company are not realizable.  The Company's actual realizable value, which it represented to its creditors and to the market in general, was approximately $300 million.  The Company also publicly disclosed that its auditors stated that the Company's financial position "raises substantial doubts about its ability repay [its loans] . . . and continue as a going concern."

34.     Because the Company's assets were insufficient to cover its debts and insufficient to pay the creditors, the Board's fiduciary duties had shifted from the Company's equity shareholders to its creditors.

### Defendant Andersson's Conflicts of Interest and Mr. Ostling's Blowing the Whistle on those Conflicts

35.     In 2016, it became evident that the Company's Chairman, Andersson, as a significant shareholder and self-declared Executive Chairman of the Company, had significant conflicts of interest in negotiating a deal with the Company's creditors.

36.     The Shareholder Committee, which was tasked with maximizing shareholder value, was to be fully independent of the Company's Board members and management.  The Shareholder Committee, however, included individuals, including its chairman and others who had long ties to Andersson.  On information and belief, these committee members acted and currently act as improper proxies for Andersson —

a.       Roger Wills, the Chairman of the Shareholder Committee, served as CEO of Brunswick Capital and Brunswick Rail Leasing and COO of Brunswick UBS, all of which are entities founded by Andersson and on which Andersson sat on the Board as a director and/or Chairman of the Board.

b.       Edward Allanby is a member of the Shareholder Committee and is the founder of Leman Management, a Bermuda company.  Prior to founding Leman Management, Allanby was CFO of the Brunswick Group, an entity founded by Andersson and De Geer. Allanby was continuing to serve Andersson's and De Geer's interests in many entities.

c.       Carl Fredrik Olov Janglin  is a member of the Shareholder Committee and is the CFO of Brunswick Real Estate UK, another entity founded by Andersson and for which Andersson is a partner along with De Geer.  Janglin is also a partner of Bruton Advisers, an entity that Andersson was formerly a director.

37.     Additionally, in October 2015, at Andersson's direction the Company engaged Dominik Dolenec as Brunswick's Chief Restructuring Officer in assisting the Company to renegotiate its debt.  Andersson failed to properly disclose his substantial ties to Dolenec.  It became clear to Mr. Ostling that Dolenec, and financial and legal advisers that Dolenec recommended, were beholden to Andersson and worked for Andersson's interests, rather than the interests of all stakeholders. Mr. Ostling raised his concerns regarding the inappropriate and biased focus of Dolenec and the advisers he recommended.

**Andersson's Pressuring of Mr. Ostling to Present Inaccurate Information to the Board**

38.     From June 2016 through Mr. Ostling's termination in November 2016, Andersson instructed that Board presentations be changed and portions of Board presentations eliminated when those market updates and analyses showed that ⬛REDACTED⬛

⬛REDACTED⬛

39.     Mr. Ostling and others at the Company believed that ⬛REDACTED⬛ ⬛REDACTED⬛ ⬛REDACTED⬛ It was in Andersson's interest, however, as a substantial shareholder to disclose ⬛REDACTED⬛ because it had an impact on the imputed valuation of the Company, lowering it.  This insured leverage could be used, particularly against the junior creditors like MRIF, arguing that they were clearly "out of the money." ⬛REDACTED⬛ Andersson, on a number of occasions, blocked the inclusion of these accurate projections ⬛REDACTED⬛ ⬛REDACTED⬛

40.     Mr. Ostling complained to the Audit Committee Chairman Aaron Rubin and another Board director, Anders Lidefelt, of the pressure he received to present inaccurate projections.  Mr. Ostling also complained to Defendant De Geer in Zurich, Switzerland the evening before a Board meeting in August 2016, about the impacts of Andersson's conflicts of interest, the ⬛REDACTED⬛ and Mr. Ostling's struggle to provide accurate reports to the Board.  Mr. Ostling voiced his concerns to others, including the company's outside auditor, Deloitte.

**Mr. Ostling's Refusal to Agree to a Scheme to Defraud the Creditors
and Subsequent** REDACTED **From the Company**

41.     Andersson, the other defendants and others in concert with them proposed

improper restructuring schemes that were meant to damage and/or defraud the Company's

creditors to the benefit of Andersson and other shareholders aligned with Andersson.  These

schemes included the following:

a.     In July 2016, Andersson tasked Dolenec to prepare a "straw case" for the

future structure of the Board that, among other things, would    REDACTED

REDACTED

REDACTED     Mr. Ostling

informed Andersson and others involved that he did not support the straw case.    REDACTED

REDACTED

b.     In December 2015, Andersson's recommended advisers proposed    REDACTED

REDACTED

Mr. Ostling, along with Rubin and Lidefelt, disapproved of the proposal and made known to

Andersson and others that he would never approve of    REDACTED

c.     Also in December 2015, Andersson brought in NORT Group, which

describes itself as a Moscow-based special situations advisory firm focused on loan

restructurings on behalf of troubled borrowers.  NORT Group proposed that    REDACTED

REDACTED     NORT

produced a set of slides demonstrating the illegal procedure. Ostling told Andersson he would

never do such an illegal procedure, and also informed Rubin and Lidefelt.

        d.    In January 2016, Andersson and his recommended advisers proposed 

REDACTED Mr. Ostling, Rubin and Lidefelt refused to consider an illegal

REDACTED

        e.    During May and June 2016, the Company considered REDACTED

REDACTED Andersson and his recommended advisers

proposed that, REDACTED

REDACTED

REDACTED Mr. Ostling believed that such a

process would be a fraud REDACTED

REDACTED and told Andersson that he would immediately resign if the Company

moved forward with REDACTED

    42.    It was clear to Mr. Ostling and others on the Board that these REDACTED

REDACTED as well as other proposed options were meant to defraud the Company's creditors of

economic value in the Company that would rightfully belong to them and improperly positioned

the Company's equity shareholders' interests, including Defendants' interests, above the interests

of the Company's creditors.  Mr. Ostling reasonably believed that such alternatives would be

unlawful under applicable Bermuda, UK and US laws and made clear to the full Board, and the

Company's third-party advisers that he would never approve of such actions. He was supported

in his position by the majority of the Board (himself, Rubin and Lidefelt).

43.     In October 2016, Rubin proposed resolutions for the Board to consider, including that **REDACTED**

**REDACTED**

Defendants, including Andersson and De Geer, pressured Mr. Ostling and Lidefelt to not agree to the second resolution.

44.     At a Board meeting on or about October 27, 2016, the Board **REDACTED**

**REDACTED**

45.     In late October 2016, the Bondholders rejected any further negotiations for a consensual deal.  At a subsequent Board meeting, the Company's advisers stated that **REDACTED**

**REDACTED**

46.     Prior to the next Board meeting, De Geer called Mr. Ostling and pressured him to vote against the second Rubin resolution, and to approve **REDACTED**

**REDACTED**

**REDACTED** Mr. Ostling made clear to De Geer again that he and Lidefelt as directors would never

approve of an **REDACTED** Mr. Ostling stressed to De Geer that Mr.

Andersson and the Board needed to negotiate in good faith with the creditors. Upon information

and belief, Lidefelt had a similar call and Lidefelt gave a similar answer.

47.     Andersson and those aligned with him understood that the majority of the Board

— Mr. Ostling, Lidefelt and Rubin — **REDACTED** In

November 2016, prior to that next Board call, on information and belief, Andersson and De Geer

(conspiring with Pascault, Ryan, Koshkin, Naumova, Roger Wills, Edward Allanby, Carl

Janglin, Ian Twinn, Kamen Zahariev, Marina Keremelidi, and Vitaly Kuznetsov), retaliated

against Mr. Ostling for not agreeing to their scheme **REDACTED** and orchestrated

Mr. Ostling's and Lidefelt's removal from the Board. **REDACTED**

**REDACTED**

48.     On information and belief, at Andersson's direction and with the approval and

assistance of De Geer, Pascault, Koshkin and Naumova, , the Board **REDACTED**

**REDACTED** and replaced them with directors (Ryan, Pascault, and Manassov) who were

precisely selected to support the conflicted position of Andersson and wrongfully put the

interests of the Defendants and shareholders over the interests of the creditors.

49.     By letter agreement dated November 13, 2016, Mr. Ostling resigned his positions

at the Company as a result of the Board's termination, as did Lidefelt.

**The Company Publicly Misstates Projections, Selectively Discloses**
**REDACTED** **and Further Retaliates Against Mr. Ostling**

50.     Immediately after Mr. Ostling's **REDACTED** upon information and belief, Andersson directed Pascault and Koshkin to **REDACTED** **REDACTED** Pascault and Koshkin also met with Brunswick counterparties to agree to **REDACTED** **REDACTED**

51.     Richard Sultanov, who was at the time the Director of Strategic Marketing, Development and Communications at BRM, informed Mr. Ostling that the Company pressured Sultanov to publicly file this false 2017 projection in November 2016 **REDACTED** and that the projections were purposefully misstated.  Based on his work on the projections before his ouster from the Company, Mr. Ostling also believed that the publicly disclosed 2017 projections were misstated and **REDACTED** **REDACTED**

52.     Mr. Ostling notified Rubin, Chairman of the Audit Committee, about his and Sultanov's concerns regarding the projections.  Both Mr. Ostling and Sultanov had honest and reasonable beliefs that the Company's intentionally misstated projections violated U.S. and U.K. securities and corporate laws.

53.     In late November **REDACTED** **REDACTED** sent a letter notifying the Company **REDACTED** **REDACTED** Mr. Ostling believed the Company was obligated to disclose the letter to its shareholders and creditors because it was price-sensitive information under both U.S. and U.K. securities and corporate laws.  The Company, however, waited to disclose the letter, and instead selectively disclosed it to certain shareholders.  This selective disclosure permitted the Company to **REDACTED**

17

**REDACTED**

**REDACTED** Instead, on information and belief, Defendants negotiated an improper deal **REDACTED** **REDACTED**

54.     Sultanov told Mr. Ostling that he planned to file a whistleblower complaint with the SEC and FCA relating to: the Company's hiding and selective disclosure of **REDACTED** **REDACTED** letter and public disclosure of false and misstated projections that misrepresented the true value of the Company; and, the Company's repeated false disclosures that the Board and management had no role in the Shareholder Committee.

55.     Mr. Ostling also notified and complained to Rubin and Jacques Strydom, Brunswick's independent auditor at Deloitte, that the Company selectively disclosed the **REDACTED** letter and published misstated projections.  Mr. Ostling also informed them that Sultanov would file a whistleblower complaint with the SEC and FCA.  **REDACTED**

**REDACTED**

**REDACTED**

56.     On December 25, 2016, Sultanov filed whistleblower complaints with the SEC and FCA, which Mr. Ostling later (after earlier having whistleblown to the auditors, **REDACTED** **REDACTED** the audit committee chair, and other board members as set forth in this Complaint) formally joined.

57.     After Sultanov filed the whistleblower complaints with the SEC and FCA, Defendants filed a retaliatory lawsuit against Mr. Ostling and Sultanov in the Northern District of California on January 4, 2017, asserting baseless claims that Mr. Ostling and Sultanov improperly disclosed confidential and trade secret information and breached fiduciary duties for

personal gain.  Defendants did so in retaliation for Mr. Ostling and Sultanov reporting the

Defendants' violations to others entitled to know about the Company's actions and to the SEC

and FCA.

58.     On January 25, 2017, Defendants filed suit against Mr. Ostling in this District

again bringing baseless claims that Mr. Ostling improperly disclosed confidential and trade

secret information and breached fiduciary duties for his personal gain.  Defendants did so in

retaliation for Mr. Ostling and Sultanov reporting the Defendants' violations to others entitled to

know about the Company's actions and to the SEC and FCA.

**The Company Refuses Mr. Ostling's Demands for Indemnification**

59.     On January 13, 2017, Mr. Ostling, through counsel, provided a notice and demand

of indemnification to the Company pursuant to the Appointment Agreement and the Company's

Bye-Laws.  Mr. Ostling demanded that the Company indemnify him for losses resulting from the

California action.

60.     In further retaliation against Mr. Ostling, by letter dated January 31, 2017,

Brunswick improperly denied Mr. Ostling's claim for indemnification.

**Defendants Further Retaliate By Threatening Criminal Prosecution In Russia**

61.     In further retaliation against Mr. Ostling and Sultanov, on March 10, 2017,

Defendants threatened to initiate a criminal case against Sultanov in Russia and implicitly

against Mr. Ostling.  On information and belief, Defendants intended to intimidate and coerce

Mr. Ostling and Sultanov into ceasing their whistleblowing and to capitulate to Defendants'

improper intentions.  Since that time, Defendants have confirmed that they acted on their threat

to file a criminal complaint and are threatening to file civil actions in Russia.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Anti-Retaliation Pursuant to Dodd Frank (15 U.S.C. § 78u-6)
### (Against All Defendants)

62.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

63.     Plaintiff engaged in activity protected by Dodd-Frank when he expressed his objections pertaining to, and ultimately reported, Defendants' fraudulent activities.  Plaintiff complained of potential securities law violations prior to his ouster as CEO and Director and ultimately Sultanov filed whistleblower complaints with the SEC, and Mr. Ostling joined them.

64.     Plaintiff had a reasonable objective and subjective belief that Defendants engaged in conduct that violated U.S. securities laws, by scheming to defraud its creditors, presenting false material information to interested parties, and selectively disclosing the **REDACTED** letter in violation of Section 10(b)(5) of the Securities Exchange Act and in violation of obligations and duties owed to the creditors.

65.     Plaintiff reported his beliefs internally at the Company to individuals with the authority to investigate, discover, or terminate Defendants' misconduct.

66.     Because Plaintiff reported Defendants' fraudulent activity internally and to the SEC, Plaintiff is a whistleblower within the meeting of Dodd-Frank and is afforded protection under the statute.

67.     Plaintiff suffered adverse employment actions when Defendants intentionally ousted Plaintiff as CEO and Director of the Company, refused to indemnify Plaintiff, filed baseless lawsuits against him, and threatened criminal prosecution in Russia.  Defendants' conduct was made in retaliation of Plaintiff's protected conduct.

68.     As a proximate result of Defendants' actions against Plaintiff, Plaintiff has been harmed in an amount to be proven at trial, including, but not limited to, the amount of his lost wages, benefits, attorneys' fees, litigation-related cost and other losses.

## SECOND CLAIM FOR RELIEF

### Breach of Contract—Failure to Indemnify in Violation of the Appointment Agreement
### (Against Defendants BRM and BRGL)

69.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

70.     Pursuant to the Appointment Agreement between Plaintiff and the Company, Plaintiff is entitled to indemnification from the Company for "any liability incurred . . . in defending any proceedings whatsoever, whether civil or criminal."  This includes Plaintiff's defense costs arising from the actions initiated by Defendants BRM and BRGL against Plaintiff in the Northern District of California and in this District (collectively, the "Actions").

71.     Plaintiff is incurring and has incurred attorneys' fees and expenses in connection with defending the Actions, the exact amount of which is to be determined.

72.     Defendants BRM and BRGL, as indemnitors, are in breach of their obligations to Plaintiff by failing and refusing to indemnify Plaintiff for his losses incurred, including his attorneys and litigation fees, and to be incurred as a result of the Actions.

73.     Defendants' proffered reasons for refusing to indemnify Plaintiff are pretextual, as demonstrated in the complaints in the Actions against Plaintiff.

## THIRD CLAIM FOR RELIEF

### Breach of Contract—Failure to Indemnify in Violation of the Bye-Laws
### (Against Defendants BRM and BRGL)

74.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

75.     Pursuant to the Company's Bye-Laws and the laws of Bermuda, Plaintiff is entitled to mandatory indemnification from the Company for defense costs arising from the Actions initiated by Defendants BRM and BRGL against Plaintiff.

76.     Plaintiff is incurring and has incurred attorneys' fees and expenses in connection with defending the Actions, the exact amount which is to be determined.

77.     Defendants BRM and BRGL, as indemnitors, are in breach of their obligations to Plaintiff by failing and refusing to indemnify Plaintiff for his losses incurred, including his attorneys and litigation fees, and to be incurred as a result of the Actions.

78.     Defendants' proffered reasons for refusing to indemnify Plaintiff are pretextual, as demonstrated in the complaints in the Actions against Plaintiff.

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgment
### (Against Defendants BRM and BRGL)

79.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

80.     Defendants BRM and BRGL have refused to indemnify Plaintiff pursuant to the indemnification provisions of the Appointment Agreement and Bye-Laws.

81.     An actual, present, and justiciable controversy exists between Plaintiff and Defendants BRM and BRGL concerning Plaintiff's right to indemnification pursuant to his Appointment Agreement and the Company's Bye-Laws.

82.     Plaintiff seeks declaratory judgment from the Court that Defendants are obligated to indemnify Plaintiff for all judgments, expenses, and attorneys' fees in connection with the defense of the Actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment as follows:

A.      On his First Claim based on retaliation for whistleblowing, demands judgment against Defendants, including, but not limited to, economic, compensatory, and statutory damages under Dodd-Frank, and reasonable attorneys' fees and expenses.

B.      On his Second and Third Claims for indemnification, demands:

a)   judgment against Defendants BRM and BRGL, including, but not limited to, attorneys' fees and expenses in connection with defending the Actions; and

b)   an Order requiring specific performance of the indemnification provisions of the Appointment Agreement and the Company's Bye-Laws.

C.      On his Fourth Claim for declaratory judgment, Plaintiff seeks a declaration that, under the Appointment Agreement and Bye-Laws, Defendants BRM and BRGL are obligated to indemnify Plaintiff for all judgments, expenses, and attorneys' fees in connection with the defense of the Actions.

D.      Awarding punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial.

E.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

PLAINTIFF PAUL J. OSTLING


By:   /s/ Glenn M. Cunningham_____
      Glenn M. Cunningham (ct09995)
      Ross H. Garber (ct17689)
      Susan S. Murphy (ct25321)
      SHIPMAN & GOODWIN LLP
      One Constitution Plaza
      Hartford, CT 06103
      Tel: 860-251-5000
      Fax: 860-251-5218
      gcunningham@goodwin.com
      rgarber@goodwin.com
      smurphy2@goodwin.com

      Thomas E. Wallerstein*
      VENABLE LLP
      505 Montgomery Street, Suite 1400
      San Francisco, CA 94111
      Tel: 415-653-3750
      Fax: 415-653-3755
      TWallerstein@Venable.com

      George Kostolampros*
      VENABLE LLP
      600 Massachusetts Avenue, NW
      Washington, DC 20001
      Tel: 202-344-4000
      Fax: 202-344-8300
      GKostolampros@Venable.com


      *Counsel for Plaintiff Paul J. Ostling*

      *not yet admitted pro hac vice*